## COLUMBIA QUARRY COMPANY v. GIVEN, HOBBS & COMPANY.

Western Section.   June 3, 1927.

Petition for Certiorari denied by Supreme Court, January 21, 1928.

1. **Evidence.** In an action for breach of contract evidence as to sales made by defendant after the date which defendant alleged it became impossible to complete the contract held proper.

Where the plaintiff contracted with the defendant to furnish certain crushed stone and failed to complete the contract because of the destruction of one of its quarries, and it defended on the ground that it was im-

possible to furnish the stone and defendant's witness refused to testify as to the rock sold after the date at which it alleged it was impossible to complete the contract, held that the evidence was properly admissible and the defendant's refusal to testify raised a presumption that the evidence was damaging to defendant.

2. **Contracts. Party is discharged from fulfilling a contract only when it is put beyond its ability to perform by causes beyond its control.**
    In an action to recover damages for the failure to furnish stone where the defendant urged that it could not complete the contract because its quarry was destroyed by fire, held that the evidence did not show that the defendant could not have gotten the stone from other quarries of its own or have purchased it elsewhere, and defendant was not excused from performing the contract.

Appeal from Chancery Court, Weakley County; Hon. V. H. Holmes, Chancellor.

Affirmed.

L. E. Holliday, of Dresden, for appellant.

Maiden, Rowlett & Maiden, of Dresden, for appellee.

HEISKELL, J.  This is a suit brought by the Columbia Quarry Company, a Missouri Corporation having its office in St. Louis, and its quarries in Illinois, to collect a balance claimed to be due for crushed stone furnished the defendants, a partnership composed of A. N. Given, T. H. and A. T. Hobbs, R. E. Maiden and L. P. Moore, operating under the firm name of Given, Hobbs & Company.

The defendants had entered into a contract with the Department of Highways & Public Works of the State of Tennessee to construct a hard surface road from Trenton to Humboldt, Tennessee, and in order to procure the necessary crushed stone for said work, made with the complainant a contract of which the following is all that is material.  . . .

"Contract in Duplicate for Crushed Limestone

"Memorandum of agreement between the Columbia Quarry Company, a corporation incorporated under the laws of the State of Missouri, party of the first part, and Given, Hobbs & Company, doing business under the name of Given, Hobbs & Company, with headquarters at Martin, Tennessee, party of the second part.

"The party of the first part agrees to furnish the party of the second part all the crushed limestone required to complete the present contract of the party of the second part and as required during the progress of the work of paving Federal Aid Project No: 86, Gibson county, Tennessee; being approximately 24,000 tons of stone.

"Freight Rates:  Price named in this contract is based on a $1.08 freight rate from Krause and Columbia, Illinois, via Mobile & Ohio R. R. to points named in this contract.

"The party of the second part shall give the party of the first part shipping instructions a reasonable time before shipments are to be made, and the party of the first part shall not be responsible for delays in transportation, strikes, car supply, or other causes beyond their control.

"It is also agreed that the above named price will be increased or decreased in proportion as the railroads increase their freight rates from our quarries to the stations named in this contract."

Complainant had five crushing plants—No. 1 at Krause, Illinois; No. 2 just outside of Columbia, Illinois. These two close together, the other three at other points but all in a radius of fifteen miles. Complainant furnished stone under this contract from May 31, to August 28, 1924. On September, 1924 plant No. 1, the largest plant of complainant and the one from which stone was being furnished to the defendants, was destroyed by fire, caused, it is alleged, by a stroke of lightning. Complainant then notified the defendants that it could not furnish any more stone under said contract. At this time there was a balance due complainant of $2070.82, but defendants did not pay this because they insisted that the default of complainant in furnishing the stone which it was necessary for defendants to have, compelled them to purchase stone from other concerns at a higher price than the contract price with complainant and that this difference and consequent loss to defendants amounted to $3785.02. These facts and contentions are set up by defendants in an answer and cross-bill wherefore they claim that the complainants are indebted to them in the sum of $1715.38. The complainant, by way of answer to the cross-bill, pleads the destruction of its plant, No. 1, that this made it impossible for it to carry out the contract and absolved it from all obligation to do so. The Chancellor found the facts as follows:

"Complainant and defendants contracted, in writing, for the sale and delivery by complainant to defendant of a sufficient quantity of crushed limestone to enable defendants to complete a road contract.

"Pursuant to the contract, complainant during the months of June, July and August, 1924, delivered certain quantities of stone, for which there is an unpaid balance of account due complainant to the amount of, on August 28, 1924, $2609.64.

"Complainant, at the time of making the contract was operating five quarries. However only two of these quarries were producing the kind of crushed stone to be furnished under their contract. The two quarries producing the kind of crushed stone to be furnished to defendants were each located near to Columbia, Illinois, and approximately three-quarters of a mile apart.

"The stone for defendants was being shipped from quarry No. 1, which had an out-put capacity of about twenty-eight car loads per day. The out-put capacity of quarry No. 2 was from twelve to fifteen cars per day.

"On the 1st day of September, 1924 the plant at quarry No. 1, was totally destroyed by fire, without fault of complainant. This plant was not rebuilt and ready for operation for nearly a year thereafter.

"It appears that after the fire, quarry No. 2 was operated both night and day. It is not shown what was the out-put under such conditions. Complainant refused to furnish evidence admittedly in their possession, showing what quantities of crushed stone were produced and sold by them after September 1, 1924 and before December 1, 1924.

"After the fire complainant refused to deliver any more stone to defendants.

"In order to complete their road contract, defendants were compelled to purchase stone from other quarries, at an increased cost above what the same quantities would have cost under the contract with complainant, amounting to $3785.02.

"The contract did not provide that the stone was to be shipped from the quarry that was destroyed by fire.

"Complainant has wholly failed to show that the destruction by fire of its quarry No. 1, put it beyond the power of complainant to comply with the contract."

From the decree based upon this finding of facts the complainant has appealed and assigned errors. There are eighteen assignments but only one question is presented for determination. That is, did the destruction by fire of its plant No. 1, absolve the complainant from all obligation under the contract to furnish any more stone to the defendants and this question involves the correctness of the Chancellor's holding that the complainant had failed to show that the destruction of said plant put it beyond its power to comply with the contract.

There is little room for a controversy about the facts. There is no question about the execution of the contract. There may be some difference as to the construction. There is no doubt about the destruction by fire of plant No. 1 on September 1, 1924. There is some contention that complainant was negligent in the construction and maintenance of this plant, but we think the proof on this point is not sufficient to affect the question of liability under the contract. There is some claim by defendants that complainant failed to furnish some stone that it was obliged to furnish between May 31st and September 1st but this is too vague to affect the question of amount due September 1st, so this can be fixed at $2070.82. There

is no doubt that the complainant gave notice after the fire that it could furnish no more stone and it is beyond question that defendants were obliged to have stone to carry on their contract with the State and that they were obliged to buy what they did buy and that they purchased it at the lowest price at which it could be obtained, and that it cost them $3785.02 more than the price at which complainant had contracted to supply it. If complainant was bound by the contract to furnish this stone after September 1st, the decree is right, otherwise it is wrong.

Complainant at the time of making the contract owned five quarries with crushing plants. Its representative stated to defendants that these plants were capable of putting out 4000 tons per day. This was by way of inducement to the contract. Plant No. 1, at Krause, Illinois, had a capacity of twenty-eight tons per day. Plant No. 2 of twelve to fifteen but after the fire, by working a double shift, this was increased to twenty cars per day. Harry F. Schmidt is the principal witness for complainant. He says, after the fire at No. 1, it was impossible to furnish any more stone to the defendants. He is cross-examined by counsel for defendants in the effort to test the correctness of this conclusion. He says complainant had contracts with five or six other parties engaged in road building. Price at quarry to defendant was 96c, to one other $1. Then counsel for complainant objects and witness answers no further. This witness admits they had some of these other contracts at the time of entering into contract with defendants and some were made afterward. The witness is then pressed to state what became of the stone from other quarries after the fire at No. 1. On what contracts it was shipped and at what price. He says he cannot tell without looking at the books which are under his control. He is then asked to produce the books or answer from the books which are shown to be on the same street with the office in which the deposition is being taken and about four blocks distant. This is objected to on the ground that it would disclose trade secrets and the witness is instructed by counsel not to answer except to state what the total output of the quarries was during the time in question. He says this would take him five or six days and he does not offer even this.

We think this was proper matter for cross-examination. The witness says to defendant that it was impossible to furnish you any stone after September 1st. We had other contracts for road building stone, some prior to yours, some subsequent. How much we furnished on these I cannot tell without looking at the books. Counsel says don't tell from the books except how much you crushed and he says it would take him five or six days to figure this out. There must have been a good deal of it.

It would have done counsel for defendant and cross-complainant little good to know how much stone was crushed during the time within which the defendant was obliged to have stone to complete its road building contract. It might have been of vital importance to know what stone was furnished to other contractors and at what price. Suppose it had been shown that a large amount of stone had been furnished to some road builder whose contract was subsequent to that of the defendant and at a greater price than that provided for in defendant's contract. It would have completely overthrown the conclusion of Mr. Schmidt that the fire rendered it impossible to furnish defendants any more stone whatever. When counsel for complainant refused to allow the witness to answer this line of cross-questions, the defendant became entitled to the strongest presumptions fairly to be drawn in their favor as to what the witness would have said or the books would have shown if he had been allowed to answer. From the record in this shape and put in this shape by the complainant, the Chancellor was warranted in finding as he did that "complainant has wholly failed to show that the destruction by fire of its quarry No. 1 put it beyond the power of complainant to comply with the contract."

We think this is conclusive of the case and answers all the assignments of complainant. Yet something more might be said in favor of the contention of the cross-bill and the Chancellor's decree. By the contract complainant undertook to furnish the requisite stone for defendant's section of road. Suppose it could have made a profit by purchasing the stone from another quarry. The defendant could not have objected if the stone answered the specifications. On the other hand, then, if complainant could have purchased stone from other quarries, crushing stone from the same ridge of rock, did not the contract impose this duty on the complainant rather than on the defendant? There is evidence tending to show that neighboring quarries, using same rock supply, offered to assist complainant after its fire. It was not impossible for defendants, without any assistance from complainant, to procure the necesssary stone by paying more for it. If complainant could obtain it in the same way, could it be said to be impossible to furnish it? The contract obligated complainant to furnish the stone. It did not limit the manner in which the complainant should obtain the stone for delivery. The contract provides that the price shall be increased or decreased in proportion as the railroads increased or decrease their freight rates, etc., but there is no provision for any change by reason of greater cost to complainant in procuring the stone for shipment.

Counsel for complainant plant themselves on the language of the contract—"and the party of the first part shall not be responsible for delays in transportation, strikes, car supply, or other causes be-

yond their control." These stipulations seem to contemplate the matter of delays in shipment. Both strikes and car supply suggest the idea of delay in transportation and other causes might well refer to the same subject and not to the obtaining the stone. If complainant had obtained the stone from another quarry, these same stipulations would have had force and effect. There might have been delay in transportation, strikes, car shortage, etc. But however this may be, if complainant is discharged from its liability by reason of causes beyond its control, the causes must be such as put it out of complainant's power to obtain the stone for defendant. Complainant has not carried this burden until it has eliminated all sources of supply, by showing that it has not used for other purposes stone that could and should have gone to defendants, that it could not increase the out-put of road building stone from other plants of it own and that it could not obtain similar stone from quarries owned by others. As the Chancellor found, complainant has not done this. On the contrary, by refusing to allow the introduction of evidence within its control it has put into the record an affirmative presumption that stone could have been furnished to defendants after September 1, 1924.

A good deal is said by complainant's counsel about the plants other than No. 1 producing fluxing stone as distinguished from stone for road making, but it is not shown that these plants could not crush road stone, and the evidence leaves the impression that they could. As an inducement to the contract, the statement was made that the plants had a capacity of 4000 tons per day. Taking forty-five tons to the car, this would be more than 80 cars a day. The defendants needed 24,000 tons for their road contract. It would have taken only six days to produce this. Another view of the matter. This 24,000 tons was used by defendants during a period of six months or say 180 days, or an average of say 130 tons or about three car loads per day. So it should have been no great burden to carry out this contract.

All assignments of error are overruled and the decree of the Chancellor is affirmed. A decree will be entered against the appellant and its surety on the appeal bond for the amount of the decree below with interest and costs.

Owen and Senter, JJ., concur.